OPINION. FisheR, Judge: Respondent concedes that petitioner’s license agreement with its principal stockholder, Ted Nelson, was an intangible asset which made important contributions to its income and was, therefore, a qualifying factor under section 722 (c). Respondent denies, however, that petitioner’s excess profits tax credits, computed under the invested capital method, are an inadequate standard of normal earnings or that petitioner is entitled to excess profits tax relief for either of the taxable years involved. The reconstruction of normal base period earnings under section 722 (c) is similar to that in certain types of section 722 (b) (4) cases; that is,, the average base period net income is determined in relationship to what the taxpayer’s earning level would have been at the end of tlie base period if the business had been commenced 2 years prior thereto. See sec. 35.722-4 (c) of Regs. 112; E. P. C. 35; and Bulletin on Section 722, Part VII (E), p. 136. In making such determination, in the instant case, it would be assumed that the taxpayer began business at December 31, 1937, with the equipment and productive capacity it possessed at the end of its first excess profits tax taxable year. E. P. 0. 35 further summarizes the approach to reconstruction of base period earnings in 722 (c) cases as follows: Reconstruction based upon the nature of the taxpayer and the character of its business involves problems similar to those encountered in ante-dating events where the push-back rule is used in cases under section 722 (b) (4). The new business is moved back into the pre-1940 economy but its effect on competing or related enterprises must be recognized. Elements, such as war demand, which cannot be moved back under the push-back rule, cannot be moved back under section 722 (c). In short, the problem is to determine what the performance of the particular business would have been under pre-1940 economic conditions, as these conditions would have been had it performed during that period. While there is evidence that there were potential peacetime uses for stud-welding, as set forth in our findings, there is no satisfactory proof in the record that under the peacetime conditions existing in the base period and without the impetus of war-induced shipbuilding activities, petitioner would have been able to develop a profitable stud-welding business within the 2-year period from December 31, 1937, to December 31,1939. Financing was readily available to petitioner through the R. F. C. because of the urgency of war conditions. There is nothing in the record to indicate that it could have procured the necessary finances on the basis of peacetime needs during the base period. The problem of building up a market for its product would have been a serious one. The product would not have been known to any extent to peacetime users on December 31, 1937. Many prospective users had equipment for stud-welding by the process of resistance welding. While petitioner’s product had some advantages, and could be used in addition to as well as in place of the resistance-welding process, it can hardly be doubted that users would have been slow to scrap the expensive equipment which they already had. Moreover, while petitioner’s experience indicates that the sales could have been effected speedily where merely a simple substitution of stud-welding for drilling and tapping or hand welding was involved, it was admitted that (even when its product was established) where basic changes of design and tooling were necessary, selling a customer on the equipment might take from 9 months to a year. There is nothing in the record to show that a sales force adequate in numbers and training could have been developed under base period conditions which would have resulted in a peacetime demand at a profitable level by December 31, 1939. There is no more than the barest speculation as to what that demand might have been, or the point which it might have reached by the end of the base period. Likewise, there is no indication of what the initial development expense would have been during the first 2 years of activity under base period conditions. Without attempting to detail all of the adverse factors indicated by the record, we merely add to what has already been said that there is no reliable basis in the record on which we might determine the effect of base period conditions on selling price, especially in dealing with a relatively unknown product. Petitioner has been allowed excess profits credits based on invested capital of $16,229.41 for 1944 and $14,301.07 for 1945. In its proposed reconstruction, petitioner takes as a starting point its actual sales for the month of March 1943, the last month of its first complete year of operations, and by relating this production to certain industrial production statistics it arrives at a constructive average base period net income of $98,000. This figure is based on 1939 constructive net sales of $1,071,700 and a net profit for the year, computed on a 10 per cent ratio of net income to net sales, of $107,200. We realize petitioner’s difficulties in reconstructing base period earnings, but we cannot accept a reconstruction based initially on wartime sales and back-cast on a purely speculative basis. Nor can we substitute our own judgment when there is no basis in the record for the exercise of judgment. On the contrary, we might well say here, as we said in Jackson-Raymond Co., 23 T. C. 826, 836, that “* * * we cannot escape the conviction that petitioner’s business gained the success it did largely because of war conditions, and that no acceptable basis for reconstructing it as a normal, peacetime enterprise has been established. Compare Crowncraft, Inc., 16 T. C. 690; Fezandie & Sperrle, Inc., 5 T. C. 1185.” We said in Crowncraft, Inc., 16 T. C. 690, 698, in denying relief under section 722 to a manufacturer of aircraft assembly jigs, that: It [the taxpayer’s business] grew up with the war, was successful because of the war, and ceased with the ending of hostilities. Excess profits taxes were imposed not only to raise revenue, but to take the “excess profits out of war.” Petitioner’s excess profits are exactly the type of profits such taxing provisions were intended to cover. Fezandie & Sperrle, Inc., 5 T. C. 1185 (1945). * * * While petitioner’s operations did not end with the war, the important consideration is that it grew up with the war and was successful because of the war. And it has not established what it might have accomplished under base period conditions. For the reasons stated, we think that respondent’s disallowance of petitioner’s claims for relief must be sustained because of the failure of petitioner to meet his burden of establishing any acceptable basis for a reconstructed average base period net income that would result in greater excess profits credits than those available to petitioner under the invested capital method. See Green Spring Dairy, Inc., 18 T. C. 217; Sartor Jewelry Co., 22 T. C. 773. Reviewed by the Special Division. Decision will he entered for the respondent.